The third case of the day, Fliger v. Nielsen, number 17-2492. You may please the court. I'm going to start with my client, Maureen Anderson, for my client's 11 years. That's how long my client's first I-130 visa petition took. It took the United States government, Department of Homeland Security, 11 years to adjudicate an I-130 visa petition. Normally, it takes approximately six months, but this one took 11 years. During that time period, her husband had a stroke, had his leg amputated for diabetes, was blind due to cataracts, was wheelchair-bound, and was in a nursing home. That's when they had their interview for the I-130 visa petition. At that visa petition, they were immediately separated. Why you might ask? Well, I'll address the elephant in the room. There's a 53-year age difference between the parties. Isn't it pretty normal for those interviews to be done separately? Actually, no, Your Honor. In Chicago, the normal practice is to initially do them together, and then if something appears to be problematic, they will separate or bring them back for a separate interview at a later date. At least in my 12 years of practicing as immigration attorney, that's the normal practice. Fifty-three years age difference, that's, I assume, the reason why we're here today. They were immediately separated without counsel, and they were interviewed. And during the course of the interview, they took a sworn statement from Fred Kirshnick. When did this interview take place? The interview took place in 2007. Okay, and when did they first encounter each other? I'm sorry? When she took over the cleaning job and then— She met Mr. Kirshnick in 1991, when she was 14 years old. They had a friendship. She helped her sister clean his home for approximately four years, and they married in 1995, when she was 18 years old. She came to the United States from Poland without her parents and lived with her older sisters, and this is what she did to support herself along with her sisters. Will they keep reflecting back on that initial time when he said something about—or she—that they got married in order for her to be able to stay in the United States, even though things developed after that? So that is in the—there has been discussion that that was said. He withdrew that statement, though, immediately, the same day. She says that never occurred, and they waited 11 years to adjudicate the case, so he died three years after this. And beyond resurrecting him, we are unable to determine, in fact, if that ever happened. The government has consistently relied on the sworn statement that was took while he was blind, after a stroke, in a nursing home, wheelchair-bound, diabetes, at the age of, let's see, 82 years old. I was confused about that. So that—it wasn't until then that he made that statement? 11 years after they married. Was there some discussion with somebody somewhere back when they first got married? Because that was— No, Your Honor. It took the government 11 years. About her statement, whatever, somebody said that that's why she was able to stay in the United States. I'm not certain I understand the question, but— Let me—I'm not asking it very well, then, because at some point, when she's around 18 years old, and she's going to be deported, and, you know, you shake your head at that. No? Well, no, she was not—she never had any contact with the Immigration Service at all at the age of 18. She didn't have contact with the Immigration Service until they filed the affirmative application a year after marrying, and that was with the Immigration Service. Oh. She never had a notice to appear, never had any contact with the Immigration Court until approximately a little less than three years after the denial. And about a few months after that, Mr. Kirshnick passed away. Did she have a visa when she first entered? She entered with a visa. For six months as a visitor? It was a visitor's visa. And overstayed? She overstayed, yes. She didn't accumulate unlawful presence until the age of 18, of course. She could have left before that. I would also point out that she could have divorced this man during that 11-period years of time if this was not a real relationship. The Board of Immigration Appeals themselves agrees. There was a relationship here. She cared for him on a daily basis. They owned property together. She made his medical decisions. But the ALJ—I mean, there's no dispute that a relationship developed after the fact. The question is what the intent was at the time they got married, correct? But intent can be demonstrated by the actions thereafter and the evidence. Otherwise, how would you prove intent? Their intent is, they stated on many occasions, that they intended to have a marriage. But we have submitted hundreds of pages of evidence. And the only piece of evidence that the government continues to rely on is a sworn statement made by an 82-year-old man. Do you think that's legally insufficient? I do believe that it's insufficient in many ways. Well, it was done without counsel. It was done—I understand it doesn't matter. But when it's your only piece of evidence that was then immediately withdrawn— An admission of wrongdoing is usually thought of as pretty compelling evidence. But where was the wrongdoing? If you look at the statement, all he says is that part of the reason that they got married was for immigration purposes. He also says in his statement— Is that how he phrased it? Part of the reason? Well, no. He says that she said that she was going to be deported, which again, she had never had any contact with the immigration service. Okay? But he also says in that same statement, I never felt she was taking advantage of me. We've made love many times. And he indicates that he wanted to be married to her. So— But when he withdraws the statement, where he says essentially the marriage was fraudulent— But he didn't say that. No, and it's not a sworn affidavit. But he never said that. Anna asked me to marry her so she wouldn't be deported and so she could get an immigration benefit. That's— If I go to my boyfriend and say, I'm going to be deported and I want to get married so that I won't be, will you marry me? And my boyfriend will probably say yes. One does not preclude the other. And immigration benefits can be a part of the decision-making process in a marriage. That decision to marry, that has been adjudicated time and time again, that immigration benefits can be a part of the decision-making process. It's about the primary purpose. It can't be the only reason you decide to get married. But it can be a part of the decision-making process. So even assuming that this event took place, it was okay for them to utilize that as part of their decision-making process. My time is up. I'd like to save the rest for rebuttal. Thank you. Okay. That's fine. Mr. Darrell, for the government. May it please the court. Good morning, your honors. Joseph Darrell on behalf of the government. This court should affirm the district court and uphold the agency's denial of the I-130 petition as not arbitrary and capricious and as supported by substantial evidence. Section 1154C says that a visa petition cannot be granted to any alien who has attempted to enter a marriage to evade the immigration laws. And here we have pretty compelling evidence from Mrs. Flieger's former husband that that's exactly what happened. As his sworn oral testimony given to the USCIS interviewer said, he said that he found her crying while she was cleaning his house, and she asked him to marry her so that she could avoid removal, and then went on to say that they never lived together. While, of course, appellants have submitted a great deal of evidence that speaks to the thereafter, and the BIA noted that their evidence shows that they did develop a pretty robust relationship over the ensuing 15 years. When was that statement made that's so condemning here, that he made? When? That was in 2007. That was the interview. Okay. How old was he then? I know he's 80. What was he? I believe he was. Was he 71 when they married? He was 71 at the time that they married, so that would have been 11 years after that. Okay. So I'm asking so I can keep track. How old was he when he made this statement? I believe that would make him about 82 at that point. Okay. So it was a lot later. He's just reflecting back as opposed to what's going on now. It was, Your Honor, but if you look at the indicia of reliability of that statement, it's a pretty detailed statement. He didn't just say, she asked me to marry her so that she could avoid removal. She said, I found her crying, and he goes into detail the whole interchange. And then, again, he signed a statement that says, I wish to withdraw my petition for these same reasons. And really the only evidence submitted by appellants that would attempt to undermine that pretty compelling admission is this unsigned purported affidavit by Mr. Kershnick long after the – or excuse me, unnotarized affidavit by Mr. Kershnick long after the fact. And that doesn't even directly rebut the substance of the earlier admission. He says, yes, I've been taking eye drops because of my pending cataract surgery. However, that doesn't speak to the oral testimony that he gave, which, again, was detailed. He doesn't undermine that account. He doesn't say, no, we got married for a different reason. No, I loved her, and this was just a secondary thing. He says simply, I couldn't see what I was signing, which doesn't speak to the oral testimony, and I didn't understand the questions. But if you read the transcript, he pretty clearly understood what was being asked of him based on the answers he gave, which is what the agency and then the district court both found. Was the full transcript of that statement provided to the plaintiffs? No, Your Honor. It was just a summary of the statement that was made in the withdrawal form. Why? Well, Your Honor, that would appear to be the agency's practice sometimes. I mean, sometimes it provides the whole statement. Why? We've got a regulation that says the petitioner shall be permitted to inspect the record of proceeding, which constitutes the basis for his decision. I know there's some room to waffle a little bit later, but why? I find this very difficult to comprehend, unless you're dealing with classified information and there are separate provisions for that. I believe, Your Honor, it is a question of logistics. The agency deals with a great number of these cases on a regular basis, and so it's just in order to be efficient. Have you seen it, the original statement? The oral testimony? From Fred, yes. I have seen what was produced in the administrative record. Have you seen the original transcript, the full statement that he gave? Yes, that's part of the record at this point. But plaintiffs have not been allowed to see that? Well, not prior to receiving the record. They wouldn't have received that from USCIS. However, that statement is materially the same as the statement that they did receive verbatim in the Notice of Intent to Deny, which is the statement that Mr. Krishnick gave on his withdrawal form. Have you seen the written statement that he signed? Yes, I've seen that as well. Have plaintiffs? That was what was reproduced in the Notice of Intent to Deny. The original? Well, not the actual document. The manuscript signature, do you still have it? Does the agency still have that document? Yes, it's part of the record. Is it part of our record? It was part of the certified administrative record. It should be in there, and I can find the page site for Your Honor. Well, the record I saw from a distance is about this thick. Yes, it could be pretty well buried in there, but I'm happy to find that page site and file a supplemental brief. Thank you. The problem is that you've got the guy reflecting back, which is probably correct, but his things worked out. They were married for all that time, and then he had all these disabilities, et cetera, et cetera. And then he dies, and then she marries again, and married to, I think, a naturalized citizen. Is that correct now? Yes. What discretionary ability does the government have to take what is a pretty sympathetic case here? They could make an exception, but that's not up to us. But they could do that, right? Under their discretion, could they say this situation, the way it's developed, there's a sound marriage now, that other marriage was totally corrected and honest, et cetera, but other than that original reflection, which is what the government's depending on, everything was pretty amazing, actually. My understanding is that no, that the statute is pretty clear. The governments abound. They could not look at it the other way and say, you know, this really is pretty sad. We've got some other people that aren't nearly as good as these. She's married a naturalized citizen now. She waited until her husband died. She took care of him at the end when a lot of people might have hit the road. So all kinds of sad case here. But you're telling me that even the government could not correct that, not correct it, but change their mind. They're stuck. You're telling me the government's stuck with where they are. Well, the government can't grant her a visa petition under the terms of the statute. That doesn't mean the government has to remove her. But in terms of granting a visa petition based on being classified as an immediate relative, the statute precludes that. And it is admittedly a harsh statute, but Congress made that clear. And if you look all the way back to the Supreme Court's case in Litwack, Congress intended to give this preferential treatment to immediate relatives of United States citizens, particularly spouses. And it is preferential because you avoid a lot of the lines that you'd have to go through to get a visa through a different method. But the flip side of that is that the law is very harsh for people who attempt to game the system because it is so easy to be fraudulent. So do you want to address the 11-year delay? We don't have a really good answer to that, Your Honor. The immigration system is swamped, and these interviews often take a long time to accomplish. However, the- This looks like it just got lost, though. This is not a routine backlog. It is an unusually long period of time. However, I don't have information on why this particular case took that long. However, if you look at the answers that Mr. Kirshnick gave, they don't seem to be fogged by the passage of time. He's pretty clear on a lot of details. And in his attempt to recant that original testimony, he doesn't say, well, you know, my memory was foggy. He gives other reasons why that his original oral testimony should not be taken into account. But there's none of this, you know, I couldn't remember exactly, which I think if you look at the actual oral testimony, bears that out, that he didn't remember the details. I would just like to speak, and I see my time is running low. I'd like to speak very quickly to Appellant's point that you can have other reasons for getting married or that there can be legitimate feelings in addition to the attempt to evade the immigration laws, and that makes it okay. This court in the criminal context, in the DeReef case, you know, with criminal context and not directly on point, but similar reasoning, pointed out that you can get married for several reasons, and the fact that there might be feelings that develop or that you might intend to live together doesn't undermine the fact that there was an intent to evade the immigration laws. And I think here Mr. Kirshnick's statement makes that pretty clear that that was the primary purpose of their marriage. And do you think primary purpose is the correct standard? Yes, I do. Okay. Thank you, Counsel. Thank you very much. Rebuttal, Ms. Anderson? Yes. So, first of all, I'd like to address the issue of primary purpose. I agree. Your primary purpose cannot be to evade the immigration laws. That was not the primary purpose here. It could have been one of the purposes, based upon the recanted statement that was made 11 years after the event supposedly occurred, but it cannot be primary. And we would argue it was never primary. That they immediately established a life together, and they continued a life together for 15 years with many, many hurdles. Many hurdles. Living together, not living together, nursing home, home repossessed, all kinds of business that was lost. There was all kinds of issues here. And I'd like to address one of the questions that you had. Can the government fix this? You can overcome a 204C finding. That's why we're here today. How do you overcome a 204C finding? The point is you have to establish additional evidence to demonstrate that your marriage was bona fide and that you intended to establish a life together. How much evidence do they have to present? Hundreds of pages have been presented in this case to establish that they would have a life together. And as Posner pointed out, this isn't harsh. I'm sorry. I'm sorry. As who pointed out? Posner pointed out. Do you mean the retired Judge Posner? Yes, Your Honor. Speaking on behalf of the court or an individual? On behalf of the court, in the Galey opinion, if I may continue for just to point this out, that this is a harsh law, and one would expect the government in enforcing it to make at least modest efforts to guard against mistakes, both in terms of providing the evidence fully, not redacted, not recreated, and to properly weigh the evidence that is presented thereafter. And that's what the government has to do, not judges. Your Honor, if this court finds that the government acted capriciously and outside the law and would address that issue and remand it for them to make a decision that is appropriate within the law and the regulations and direct them to evaluate the evidence properly, it would be my hope that we would come out ahead in that case. Have you seen in the administrative record filed with this court the original evidence? Not the original, Your Honor. What have you seen? I have seen a copy of some of it, and I have seen recreations of the evidence. I don't understand what you mean by copies of some and recreations of others. Well, as opposing counsel said, the notice of intent to deny took certain portions and gave us that information, but I don't believe that we have ever seen it. Excerpts of the text? Right, excerpts. Okay. And what about the signed document? I don't believe that that is a part of the record, Your Honor. Okay. And what about the transcript? As far as I'm not even aware if there is a transcript. All right. Thank you. Thank you. Thank you, counsel. The case will be taken under advisement. We'll move on to the next case of the day.